IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WILLIAM BELCOURT, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>GRIVEL, srl, d/b/a/ GRIVEL MONT BLANC, an Italian Corporation, and GIOACHINO GOBBI, an individual, and DOES 1-100,<br><br>    Defendants. | ORDER and MEMORANDUM DECISION<br><br><br><br>Case No. 2:08-cv-00902 |
| GRIVEL, srl, d/b/a GRIVEL MONT BLANC, an Italian Corporation<br><br>    Counter-Claim Plaintiff and Third-Party Plaintiff,<br><br>vs.<br><br>WILLIAM BELCOURT, an individual,<br><br>    Counter-Claim Defendant<br><br>MARK TWIGHT, an individual, and GNA, CORP., a Utah Corporation<br><br>    Third-Party Defendant | |

In this contract dispute, Plaintiff William Belcourt has moved to dismiss all counter

claims brought against him by Defendant Grive, S.L.R. (Grivel). Third-Party Defendants Mark Twight, and GNA have also moved to dismiss Grivel's claims brought against them. The court grants in part and denies in part these motions.

**FACTUAL BACKGROUND**

Grivel is a mountaineering equipment firm based in Italy. In 2001, Mr. Belcourt and Mr. Twight traveled to Italy to discuss with Grivel the possibility of their distributing Grivel products in North America. As a result of these discussions, Grivel created GNA, a Utah corporation, in June of 2001 to act as the exclusive distributor of Grivel's products in North America. Mr. Belcourt served as president of GNA from its creation until his resignation on September 10, 2003. After Mr. Belcourt's resignation, Mark Twight served as president until GNA stopped operations in September 2008.

On April 15, 2002, GNA and Grivel entered into an agreement (the "April 2002 Agreement"). At the same time, they entered into a confidential amendment (the "Confidential Amendment") to the April 2002 Agreement. Through the April 2002 Agreement, Grivel transferred all of the stock in GNA to Mr. Belcourt and Mr. Twight.

In the April 2002 Agreement, Grivel granted GNA the right to be the exclusive distributor of Grivel products in the United States and Canada. (Belcourt's Br. at Ex. G). GNA was obligated "to buy from Grivel a minimum value, net of discount, of $600,000 for the year 2002. And $850,000 in 2003 and 2004 . . . . [w]ith a future goal in 2005 and 2006 of reaching $1,000,000." Id.

The Confidential Amendment addressed, among other things, a $250,000 loan from Grivel to GNA that would be repaid within five years and a $200,000 line of credit at Zions Bank that Grivel established for GNA. Id. The provisions addressing these loans in the Confidential

Amendment both state, "Bill Belcourt and Mark Twight, in signing this document, agree to personally stand guarantee for this debt. Bill Belcourt and Mark Twight are considered to share joint liability for the above guarantee." Id.

GNA and Grivel continued their relationship although GNA failed to meet its purchasing obligations. As a result of disputes between Mr. Belcourt and Grivel, Mr. Belcourt resigned as president on September 23, 2003. At that point Mr. Belcourt surrendered his shares of the company to Mr. Twight, who became the sole shareholder. Mr. Twight remained the president of GNA until early 2008, when GNA stopped doing business.

**PROCEDURAL BACKGROUND**

Mr. Belcourt brought suit against Grivel and Gioachino Gobbi, one of the shareholders in Grivel, in November 2008. In the complaint, Mr. Belcourt claimed that Defendants had breached the April 2002 Agreement by allowing another company, Climb High, to sell Grivel products in North America. Grivel answered the complaint, brought counterclaims against Mr. Belcourt and a third-party complaint against Mr. Twight and GNA. Mr. Belcourt, Mr. Twight and GNA have moved to dismiss all of Grivel's claims against them.

**STANDARD OF REVIEW**

Although the motions before the court are presented as motions to dismiss, Mr. Belcourt has attached nineteen exhibits to his motion. Mr. Twight and GNA incorporate Mr. Belcourt's motion into their motions. These materials are outside the pleadings. "[W]hen a district court relies on material from outside the pleadings, the court converts the motion to dismiss into a motion for summary judgment." Price v. Philpot, 420 F.3d 1158, 1167 (10th Cir. 2005).

Summary judgment should be granted when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

3

The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nomoving party." N. Natural Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).

**ANALYSIS**

**Choice of Law**

Grivel argues that the court should apply Italian law. Mr. Belcourt, Mr. Twight and GNA disagree, contending that Utah law is the appropriate law. "In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting." Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc., 24 F.3d 125, 128 (10th Cir. 1994). For both tort and contract causes of action, Utah courts apply the "most significant relationship" analysis to determine what law to apply. Id. at 128-29. For a contract claim, a court considers "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." Id. at 129. For tort claims, a court looks at "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." Id. at 128.

Having considered the relevant factors, the court concludes that Utah law governs Grivel's breach of contract claims. The April 2002 Agreement was signed in Courmayeur, Italy, but the negotiations for the contract took place in both Italy and Utah. The place of performance was primarily Utah and North America, because that is where GNA agreed to distribute Grivel's product. Grivel established a line of credit for GNA at the local Zion's Bank. Although Grivel

4

and Mr. Gobbi reside in Italy, they created GNA as a Utah company. These facts show that Utah has the most significant relationship to the contract, and the court will therefore apply Utah law to the contract claims.

Utah law also governs Grivel's conversion and unjust enrichment claims.[1] The conversion claim is based on Mr. Twight's receipt of product from Grivel. Conversion claims are governed by the law of the location with "the most significant relationship to the occurrence, the chattel and the parties." Restatement (Second) Conflict of Laws, § 147 cmt. i. Mr. Twight ordered the product to be delivered to Utah with the intent that he would then sell the product from Utah. And Grivel's relationship with Mr. Twight and GNA was centered in Utah and the United States.

Utah applies its own statutes of limitation to actions brought in Utah courts, regardless of the choice of law. Financial Bancorp, Inc. v. Pingree & Dahle, Inc., 880 P.2d 14, 16 (Utah App. 1994) ("Utah follows the majority position that limitation periods are generally procedural in nature. . . . [A]s a general rule, Utah's statutes of limitations apply to actions brought in Utah.").

**Statute of Limitations**

Several of Grivel's claims are time-barred. Under Utah law, actions for conversion must be brought within three years. Utah Code Ann. 78B-2-305(b) (2008). Actions not specified in the Utah Code, including actions for unjust enrichment, are subject to a four-year statute of limitations. Russell/Packard Dev., Inc. v. Carson, 2003 UT App 316, ¶ 11, 78 P.3d 616; Utah Code Ann. 78B-2-307(3) (2008). This four-year limitation also applies to claims of negligent misrepresentation and fraudulent inducement. Breach of written contract actions are subject to a

---

[1] Because Grivel's negligent misrepresentation and fraudulent inducement claims are time-barred, a choice of law analysis on those issues is unnecessary.

5

six-year statute of limitations. Utah Code Ann. 78B-2-309(2) (2008). Grivel brought its counterclaim and third-party claims on May 4, 2009.

The negligent misrepresentation claims against Mr. Twight and Mr. Belcourt and the fraudulent inducement claim against Mr. Belcourt all arise from events that took place before the signing of the April 2002 Agreement and, as a consequence, these claims are time-barred. But Grivel's conversion and unjust enrichment claims against Mr. Twight are not time-barred because the conduct forming the basis for these claims occurred in 2008, well within the three- and four-year statutes of limitations applicable to these claims.

The remaining claims all relate to the breach of the April 2002 Agreement. They are: failure to promote Grivel products, failure to meet purchasing obligations and failure to repay loans by March 14, 2007. "A contract action ordinarily accrues at the time of breach." S&G Inc. v. Intermountain Power Agency, 913 P.2d 735, 740 (Utah 1996). In situations "where the plaintiff, though entitled to maintain an action for an entire breach of contract, may elect to have performance of the contract continue and does so elect . . . . the statute of limitations does not begin to run as soon as a cause of action accrues." 31 Richard A. Lord, Williston on Contracts § 79.15 (4th ed. 2004). Instead, the statute of limitations "run[s] separately as to each payment or performance when it becomes due." Id. § 79.19.

The breach of contract claim against GNA, Mr. Twight, and Mr. Belcourt for failure to help Grivel get its products back from Climb High is barred by the statute of limitations. The agreement between Climb High and Grivel, made on July 24, 2002, makes clear that Grivel resolved its dispute with Climb High over six years before May 4, 2009. (Belcourt's Br. at Ex. H and O).

The parties agree that GNA distributed Grivel products until the beginning of 2008 even

6

though GNA failed to meet its purchasing obligations in 2002 and for each year thereafter. The cause of action for each year's failure to order the required amount of product accrued at the end of the calender year during which GNA did not meet its obligations. Only the claim that GNA failed to meet its purchasing obligations for 2002 and failed to promote Grivel products before May 4, 2003 are time-barred. But the claim that GNA, Mr. Twight, and Mr. Belcourt failed to repay loans by March 14, 2007 is not time-barred because the action did not accrue until the loans were not paid.

The court grants summary judgment for GNA, Mr. Twight, and Mr. Belcourt on the claims for breach of contract for failure to help recoup products from Climb High, negligent misrepresentation, and fraudulent inducement. The court also grants summary judgement for GNA, Mr. Twight, and Mr. Belcourt for any breach of the April 2002 Agreement and Confidential Amendment that took place before May 4, 2003.

**Personal Liability**

Mr. Twight and Mr. Belcourt have moved to dismiss claims brought under the 2002 Agreement and Confidential Amendment. They argue that they signed the agreements on behalf of GNA rather than in their individual capacities. Mr. Twight further seeks dismissal of the conversion and unjust enrichment claims because there is no proof that he engaged in conversion and unjust enrichment in his individual capacity. "[A] director is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." Reedeker v. Salisbury, 952 P.2d 577, 582 (Utah Ct. App. 1998) (internal quotations omitted).

<u>Personal Liability for Breaches of the April 2002 Agreement and Confidential Amendment</u>

The April 2002 Agreement and Confidential Amendment are ambiguous about whether

7

Mr. Twight and Mr. Belcourt are personally liable for the promises made under those agreements. "A contractual term or provision is ambiguous 'if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'" Glenn v. Reese, 2009 UT 80, ¶ 10, quoting Café Rio, Inc. v. Larkin-Gifford-Overton, LLC, 2009 UT 27, ¶ 25, 207 P.2d 1235.

Mr. Belcourt and Mr. Twight signed the April 2002 Agreement on behalf of GNA. But paragraph 8 of that contract states, "This agreement is between Grivel and Bill Belcourt/Mark Twight." (Belcourt's Br. at Ex. G). The Confidential Amendment was made between Mr. Gobbi "representing 100% of the capital of Grivel" and Mr. Belcourt and Mr. Twight "representing 100% of the capital [of] GNA Corp.," and Mr. Belcourt and Mr. Twight signed on behalf of GNA. Id. But the body of the Confidential Amendment repeatedly mentions Mr. Twight and Mr. Belcourt individually, including statements that the men would personally receive stock in GNA, that they accept the loan made to GNA, and that they accept Grivel's trademarks. Id. The language of the April 2002 Agreement and Confidential Amendment do not unambiguously indicate that Mr. Twight and Mr. Belcourt acted only in their corporate capacities when they signed the agreements.

Regardless of whether Mr. Twight and Mr. Belcourt are individually responsible for performance of the entire contract, both men are liable for the personal guarantee they made in the Confidential Amendment. When an agreement explicitly provides that the signatories are offering a personal guarantee, the fact that the signatories sign in behalf of a corporation does not absolve them of that personal guarantee. Appliance and Heating Supply, Inc. v. Telaroli, 682 P.2d 867, 868 (Utah 1984). Provisions in the Confidential Amendment address two loans made to GNA by Grivel, one for $250,000 to be repaid within 5 years, and one that allowed them to

draw from a $200,000 line of credit established at Zions Bank. Referring to each of these loans, the Confidential Amendment states, "Bill Belcourt and Mark Twight, in signing this document agree to personally stand guarantee for this debt." (Belcourt's Br. at Ex. G). Mr. Belcourt attaches an email from Mr. Gobbi dated March 26, 2003 that states "the money [provided to GNA in the April 2002 Agreement] was a loan to GNA and not to [Mr. Belcourt] and [Mr. Twight]." (Belcourt's Br. at Ex. Q). Even if this email is understood to be Mr. Gobbi's understanding of the contract, it conflicts with the plain language of the Confidential Amendment, which contains an explicit guarantee by Mr. Twight and Mr. Belcourt of the loan to GNA. (Belcourt's Br. at Ex. G).

The court denies summary judgment for Mr. Twight, Mr. Belcourt, and GNA on Grivel's claim for breach of the April 2002 Agreement and Confidential Amendment, except for the time-barred claims noted above.

Mr. Twight's Liability for Conversion and Unjust Enrichment

Mr. Twight seeks to dismiss Grivel's claims for conversion and unjust enrichment. "When fraud is alleged, 'a director or officer of a corporation is individually liable for fraudulent acts or false representations of his own or in which he participates, even though his action in such respect may be in furtherance of the corporate business.'" Armed Forces Ins. Exch. v. Harrison, 2003 UT 14, ¶ 19, 70 P.3d 35 (quoting 37 Am. Jur. 2d Fraud and Deceit § 322 (1968)). Mr. Twight argues that Grivel has not put forth evidence of fraud sufficient to make him personally liable for the alleged conversion of $107,000 worth of product and unjust enrichment. Although the court considers Mr. Twight's motion as one for summary judgment, the court notes that no discovery has taken place. Grivel's Counterclaim states that Mr. Twight ordered $107,000 of product intending to sell the product and keep the proceeds for himself. If evidence found in

9

discovery corroborates this claim, Mr. Twight may be personally liable for conversion and unjust enrichment. The court therefore denies Mr. Twight's motion for summary judgment on the conversion and unjust enrichment claims at this time.

## CONCLUSION

Because the court considers material outside the pleadings to decide the motions to dismiss brought by Mr. Belcourt, Mr. Twight, and GNA, the court converts them into motions for summary judgment. In considering these motions, the court applies Utah law. The court GRANTS in part and DENIES in part each of the motions. Specifically, the court grants summary judgment for Mr. Belcourt, Mr. Twight, and GNA on Grivel's negligent misrepresentation and fraudulent inducement claims because they are time-barred. The court also grants summary judgment for Mr. Belcourt, Mr. Twight, and GNA on Grivel's breach of the April 2002 Agreement and Confidential Amendment for any claim arising prior to May 4, 2003 because such claims are untimely. Untimely breach of contract claims include the claim that Mr. Belcourt, Mr. Twight, and GNA failed to assist Grivel in recouping product from Climb High and the claim that Mr. Belcourt, Mr. Twight, and GNA failed to meet their 2002 purchasing obligations. The court denies summary judgment on claims arising from breach of the April 2002 Agreement and Confidential Amendment that took place after May 4, 2003 and denies summary judgment on the conversion and unjust enrichment claims against Mr. Twight and GNA.

DATED this   19   day of March, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge